MARY SENECAL, as Administratrix, etc., of JOHN SENECAL, Deceased, Appellant, *v.* THE THOUSAND ISLAND STEAMBOAT COMPANY (LIMITED), Respondent.

*Verdict against the evidence — damages caused by the collision of two vessels — proof of previous intoxication of the person in charge of one of such vessels is inadmissible.*

In order to justify a reversal of the verdict of a jury it must be clearly and positively demonstrated that it was against the weight of the evidence.

Upon the trial of an action brought to recover damages for the death of the plaintiff's intestate, caused by the collision of two vessels, alleged to have been occasioned by the negligence of the defendant, the owner of one of such vessels, it was contended on the part of the defense that the negligence which caused the collision was that of the owner of the second vessel on which the plaintiff's intestate was, and proof was admitted of the previous habits of intemperance of the person in charge of the second vessel at the time of the collision.

*Held,* that such proof was improperly admitted.

APPEAL by the plaintiff, Mary Senecal, as administratrix, etc., of John Senecal, deceased, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of Jefferson on the 1st day of April, 1892, upon the verdict of a jury rendered after a trial at the Jefferson Circuit, and also from an order entered in said clerk's office denying the plaintiff's motion for a new trial made upon the minutes.

On the 17th of July, 1890, defendant's steamer *St. Lawrence* was used in the St. Lawrence river under the laws of the United States and of the laws of the State of New York, and one Joseph Senecal was the owner, proprietor and manager of a steamer called *Catherine* operated on the same river, and about eleven o'clock P. M. of the day mentioned a collision took place in the vicinity of

the lighthouse known as "Sunken Rock light" in the county of Jefferson, when the *St. Lawrence* struck the steamer *Catherine,* which soon thereafter filled with water and sank to the bottom of the river, and the plaintiff's intestate was drowned, he at the time being in discharge of his duties as engineer of the *Catherine.*

In the answer of the defendant it is alleged that "the accident mentioned in the complaint, which resulted in the death of John Senecal, the plaintiff's intestate, was caused by the carelessness of said John Senecal and of Joseph Senecal, the owner of said steamer *Catherine.*"

*Frederick W. Thompson,* for the appellant.

*Porter & Walts,* for the respondent.

HARDIN, P. J.:

Plaintiff upon the trial produced extensive evidence tending to indicate that there was negligence in the management of the defendant's boat, and that such negligence caused the loss of life of plaintiff's intestate. On the other hand, defendant gave extensive evidence in denial of some of the testimony of the plaintiff; in explanation of some of the circumstances relied upon by the plaintiff, and also considerable testimony tending to contradict the evidence given by the plaintiff and tending to support the theory of the defense that the accident was occasioned by the negligence of the officers in command of the *Catherine.* Appellant's learned counsel has submitted an interesting and exhaustive brief upon the evidence in his efforts to demonstrate that the verdict is wrong. After a perusal of the whole evidence the opinion is entertained that it was a question of fact for the jury to determine, under all the evidence and circumstances furnished by it, as to whether there was any negligence on the part of the defendant which caused the collision. An investigation of the evidence indicates that the boats required only two seconds to escape the collision; and the appellant's counsel submits an interesting argument, based upon assumptions to some extent, and puts great reliance and stress upon the surrounding fixed objects coupled with the speed of either boat, and the explanation of their respective situations just antecedent to the collision. Although his argument is quite persuasive, we think the questions involved in it were properly submitted to the jury; and

we are not prepared to say that the demonstration made by the appellant upon the evidence is so clear and positive that, within the well-settled rules of this court, we should overturn the verdict of the jury as one against the weight of evidence.

In *Massoth* v. *Delaware & Hudson Canal Co.* (64 N. Y. 524) it was said that it was not sufficient to overturn a verdict that a skilled engineer could demonstrate upon certain assumptions, or upon certain established points of measurement or of speed, that it was contrary to the evidence thus given. The trial judge, in a clear and extensive charge, presented the evidence bearing upon the controverted questions of fact, clearly pointing out the province of the jury in respect thereto; and after the trial was over he entertained a motion upon the minutes and presumably reviewed the evidence, and came to the conclusion that the verdict was not against the evidence or against the weight of evidence. We are not inclined to disturb his action in the premises on the ground that the evidence was so preponderating that it was his duty to set the verdict aside.

(2) Numerous exceptions were taken during the trial as to the admission and rejection of evidence, and our attention is called by the appellant's points to only one exception to the charge. After an examination of the rulings in admitting and rejecting evidence and the charge, we are of the opinion that no error was presented which requires an interference with the verdict, unless it be in the rulings relating to the habits of Joseph Senccal, who was the owner and in charge of the steamer *Catherine* on the occasion of the accident. It seems by the evidence he was a man some seventy-two years of age; he was not called upon the trial by either party. Upon one theory put forward in the case he was chargeable with the act which led to the collision. On the other hand, that theory was disputed, and it was alleged that he was free from negligence, and in referring to those theories the court, in the course of its charge, said: "The evidence on the part of the defendant, as I suggested, tends strongly to the idea that from some cause or other, we cannot tell what, because Senecal is not here to answer, for some reason or other, having by the language of the whistle indicated all along down to the very last his desire to go straight along in his course and keep the *St. Lawrence* on his right; that suddenly, when these boats came near together here, for some reason or other, after

this second signal, he changed his course and attempted to and did cross right in front of the *St. Lawrence's* course. That is what the defendant claims this evidence shows. And if that is so, and if that is the sole cause of this accident, the fact that he, misunderstanding the signals or something, did that thing, he alone is to be blamed for it, and the defendant is not to be charged with any liability for his death." The quotation already made indicates that the conduct of Joseph Senecal on the night in question was important, and was made a prominent question for inquiry. Mary Senecal, the plaintiff, the widow of the intestate, was called to prove some of the formal facts relating to the condition of life of her husband and the family he left behind him, and during her cross-examination she said that her father-in-law, Joseph Senecal, kept a boarding house and a bar in his house for the sale of liquors. This evidence was objected to as immaterial and incompetent, and the objections were overruled and an exception was taken. She then added that he "had kept a bar for the sale of liquors at his boarding house ever since we were married" (she having stated that she had been married about ten years). Thereupon the following question was propounded to her: "Q. Do you know whether Joseph Senecal was in the habit of drinking himself?" This was objected to as immaterial and incompetent, and in response to the objection the court observed: "I think I will allow it to be answered; of course, at and immediately prior to the accident. Exception for plaintiff." Thereupon the following question was propounded: "Q. What do you say as to whether Joseph was in the habit of drinking strong liquors? A. I think he took it. Q. And had been during all the years that you knew him, had he not? A. I can't say that he was a heavy drinker. By the Court: Q. He asks you if he had been in the habit? A. I believe so. He had been in the habit of drinking during all the years that I knew him, I believe. I never knew him to be intoxicated. I don't know that the old gentleman occasionally drank liquors to any extent that he became intoxicated." This was objected to on the same grounds, and then followed this question: "Q. Have you heard that Joseph Senecal occasionally drank to an extent of becoming intoxicated?" This was objected to as immaterial and incompetent, and it was received and an exception taken for the plaintiff; the witness answered: "I have heard it."

Thereupon she is further questioned by the court, to wit : " Q. Before his death had you heard of it — before your husband's death ? A. I don't know as he ever became intoxicated.  Q. The question is whether, before your husband was drowned, you had ever heard that the old gentleman sometimes got intoxicated ?  A. Not while running his boat.  Q. No, but at any time ?  He didn't ask you about the boat.  Had you heard that he did sometimes get intoxicated ?  A. No, I don't know as I ever did.  Q. Do you mean you have heard of it since ?  Because you answered at first that you had heard of it.  Have you heard since, is that what you mean, or didn't you ever hear of it ?  A. I don't know as I ever heard of it." Thereupon the counsel for the defendant took the witness and put to her the following question : " Q. Why did you answer me then that you heard that he drank to the extent of becoming intoxicated ? A. I said that he took a glass, or he took some ; I don't know as I answered that he became intoxicated   Q. Didn't you understand my question ?  A. You ask me so many questions that I don't know how I am going to understand them all.  Q.  *  *  *  Had you heard, prior to the 17th of July, 1890, that Joseph Senecal occasionally drank to the extent of being intoxicated ?  A. No, sir.  Q. When you answered me that you had heard it what did you mean ? A. Well, I have heard of him drinking, but I can't say that I know of him getting intoxicated or hurt."   From the examination which we have quoted it appears that the witness was permitted to state facts and knowledge as to the habits of Joseph Senecal, and that his condition on the night of the accident was not the subject of inquiry. It appears the witness had no knowledge of his condition on that night, and in her answers did not in any way refer to his then condition.   We are inclined to think that the trial judge allowed too great scope in the inquiry as to Joseph's habits, and that the facts which she stated in the first part of her examination, although modified somewhat by what she stated later, and the testimony given by her relating to his condition at times, may have been very influential with the jury, inasmuch as the manner in which Joseph Senecal managed his boat on the occasion, by the course of the trial, is made a close and critical, as well as a very important question.

In the course of the opinion delivered in *Warner* v. *The New York Central Railroad Company* (44 N. Y. 465) it appears that

an important question arose in that case in respect to the acts of a flagman at the time when the accident occurred, and, near the close of the opinion of LEONARD, Com., he says, in speaking of the flagman : " His previous habits of intemperance had nothing to do with the case. If the signal was omitted the negligence was the same, whether the flagman was drunk or sober. His neglect on a former occasion, or his former intemperate habits, would not be sufficient to create negligence, or be any evidence of it, when this accident happened. The evidence objected to tended \* \* \* to create a prejudice in the mind of the jury and invite punitive damages not directly arising from the occurrence." That case was referred to approvingly in *Cleghorn* v. *The N. Y. C. R. R. Co.* (56 N. Y. 44), and at page 46 CHURCH, Ch. J., says that the decision was right, and adds : " Previous intoxication would not tend to establish an omission to give the signal on the occasion of the accident." The learned counsel for the respondent upon the argument attempted to break the force of the evidence thus erroneously received by calling our attention to the charge of the trial judge wherein he says there is not much question as to the contributory negligence, and that " the more serious question in the case is whether the defendant is guilty of negligence." We think that is not a complete answer. In determining whether the defendant was guilty of negligence a very important inquiry arose in respect to the conduct of the master of the *Catherine*, Joseph Senecal, and we are inclined to believe that the jury, in scrutinizing the conduct of the master of the *Catherine*, as revealed by the evidence, might be largely influenced by the testimony relating to his antecedent habits and practices. We do not feel at liberty to say that such testimony was innocuous ; on the contrary, it may have been so prejudicial as to have produced the verdict for the defendant. If the foregoing views are correct the plaintiff is entitled to a new trial.

MERWIN, J., concurred.

MARTIN, J. :

I favor a reversal for the reasons stated in the opinion of HARDIN, P. J.

Judgment and order reversed on the exceptions and a new trial ordered, with costs to abide the event.